IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| JAMES F., and KAREN F., on behalf of C.F., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>CIGNA BEHAVIORAL HEALTH, INC., BANK OF AMERICA GROUP BENEFITS PROGRAMS,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 1:09CV70 DAK |

This matter is before the court on cross-motions for summary judgment filed by Plaintiffs James F. and Karen F., on behalf of CF, a minor ("Plaintiffs" or the "F. Family") and also by Cigna Behavior Health, Inc. ("CBH"), and the Bank of America Group Benefits Program (the "Plan") (collectively referred to as "Defendants").[1] A hearing on the motions was held on August 19, 2010. At the hearing, Plaintiffs were represented by Brian S. King, and Defendants were represented by Jack M. Englert, Jr. and James L. Barnett. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking

---

[1] Defendants have characterized their document as an "Opening Dispositive Brief," and not as a Motion for Summary Judgment. The proper terminology for dispositive motions is a subject of some debate, and the parties have used different titles for their submissions. In any event, the court's review is limited to the administrative record. In the end, both parties seek summary judgment based on the evidence in the administrative record.

the matter under advisement, the court has further considered the law and facts relating to these motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  BACKGROUND

This is an ERISA case in which CBH denied coverage for residential treatment for C.F., a teenage girl with serious mental health issues. James F. and Karen F., the parents of C.F., placed C.F. in a residential treatment facility, Island View Residential Treatment Center ("Island View"), in Utah, although the family lived in Virginia. Plaintiffs contend that coverage was wrongly denied, and Defendants disagree.

The Plan at issue specifically provides coverage for residential treatment for mental health conditions. CBH has developed a book of guidelines ("CBH Guide") for determining the medical necessity and appropriateness of various levels of care in connection with treatment of mental health conditions. The "Guidelines for Admission" for residential treatment, found on pages 23-25, include:

1. All basic elements of medical necessity must be met. AND

2. *(Either* A or B, plus *both* C and D must be met) (emphasis added)

A. There exists a pervasive and/or severe psychiatric disorder that has failed to respond to all available and appropriate outpatient interventions (including: intensive outpatient treatment, partial hospitalization, group home).

B. A reasonable course of active treatment in an acute care setting has resulted in an acceptable degree of stability – However, the stability achieved continues to require around-the-clock supervision by mental health treatment staff in a structured setting.

> C. The participant and/or family demonstrate chronic dysfunction, which may respond to multi-modal therapeutic and systemic interventions, and all parties commit to active regular treatment participation.
>
> D. The participant is able to function with some independence and participate in structured activities that will assist in developing the skills necessary for functioning outside of the controlled psychiatric environment.

C.F.'s parents divorced when she was an infant, and C.F. lived with her mother until she was approximately eleven years old. She then went to live with her father and step-mother. C.F.'s biological mother is disabled as a result of bipolar disorder. C.F. was referred for a psychological evaluation to John Sears, Ph.D. in February of 2006, by her therapist, Linda Pattee, Ph.D. Dr. Sears consulted with Dr. Pattee, conducted extensive testing for C.H. and interviewed her and her family members.[2]

C.F.'s biological mother reported that C.F. had been "seeing a therapist off and on since the age of three," and that C.F. was "moody and destructive," had engaged in cutting behaviors during the prior one-and-a-half to two years, and wondered if C.F. might have ADD or ADHD, seasonal affective disorder, and/or an eating disorder. Based on C.F.'s history, the interviews with her and with her family members, Dr. Sears concluded that C.F., among other things, "obtains gratification by demeaning and humiliating others," that her ". . . desire to provoke or

---

[2] Dr. Sears' report was not included in the administrative record. The parties disagree as to the status of the report. Plaintiffs contend that the report was clearly part of the administrative record because CBH explicitly states in its logs that the Sears Report was provided to Dr. Duitch, CBH's retained reviewer, in connection with a peer-to-peer review. Defendants, however, contend that the court cannot consider the report. The court agrees with Plaintiffs that the report should have been included as part of the administrative record. The court emphasizes, however, would reach the same ultimate conclusion even if the report were not considered.

discomfort others is strong," that she expresses a ". . . marked suspicion of those in authority,"

and is "impulsive, unpredictable, and often explosive."  Dr. Sears concluded:

> [C.F.] shows marked disturbances in executive functioning . . . . These affective, and behavioral output . . . and . . . manifest themselves as attention deficit disorder.  Her problems with initiation and shifting manifest themselves as obsessional defiant behavior and her difficulty with emotional control manifests itself as disturbances in her anger management, self-esteem, and parental, sibling and peer relationships.
>
> [C.F.] is at high-risk for problems with anger, aggression, substance abuse, and sexual promiscuity, self-injurious behavior, running away and mild forms of criminality . . . and . . . subsequent severe difficulties in interpersonal relationship, vocational functioning and academic achievement, all of which threaten her overall quality of life.
>
> [C.F.] does not have an eating disorder but does manifest obsessional defiant behaviors around food. . . .  However, the likelihood that she engages in vomiting as a method of weight control is at least moderately high.
>
> . . .
>
> [C.F.] engaged in several self-injurious behaviors. . . . cutting at a nonlethal level . . . ingesting inappropriate amounts of medication . . . ingested an excessive number of aspirin and antidepressants. . . . [C.F.'s] behavior in all of the circumstances most likely reflect self-injurious sentiments, masochistic need to express pain, and a desire for attention and desire to unlikely release internal psychological tension . . . [C.F.] is at risk for accidentally harming herself and should be monitored in this regard.

Dr. Sears recommended continuing individual and family therapy, a medication review and, following an extended period of stability for C.F., a follow-up educational evaluation to "rule out the presence of verbal learning disability as well as altered information processing deficits."

On May 25, 2006, C.F. was admitted at Poplar Springs Hospital in Petersburg, Virginia,

4

for five days of evaluation.  The Poplar Springs Hospital admission immediately followed C.F.'s treatment at St. Mary's Hospital, also in Virginia, for an overdose.  C.F. was discharged from Poplar Springs Hospital with a recommendation to continue with outpatient therapy and continue medication management.

In September of 2006, C.F. was referred to Henrico Area Mental Health & Retardation Services ("Henrico") for Henrico County, Virginia for dialectic behavioral therapy ("DBT").  C.F. was reporting recent bulimic activity, depression and feelings of emptiness.  Henrico recommended both independent and skills group dialectical behavior therapy ("DBT").  C.F. was diagnosed with Depression, NOS, Eating D/O, NOS, and noted Borderline Personality traits.  Plaintiff Karen F., C.F.'s step-mother, was very concerned about the ongoing conflict in the family.   She reported to CBH that she was concerned about the safety of the other children in the family.   Plaintiff James F. also spoke to CBH and informed them that C.F. could not be managed in the home.   C.F. was admitted to Tucker's Pavillion, a facility within the Henrico system, in February of 2007, after deterioration in her condition including:

> . . . social w/drawal, severe irritability, depressed mood, decreased appetite and food intake, low motivation and poor hygiene. Recent self-injurious behavior: cutting on legs. . . . took lighter to school and lighting papers on fire in class. . . . [Parents] concerned that cl is at high risk of harming herself, and they are unable to provide adequate supervision.

As justification for admission, it was noted that C.F. was ". . . threatening to kill self if she returns home . . . C.F. not willing to contract for safety."  C.F.'s treating therapists concluded that she "is mentally ill and/or abusing substances;" "is an imminent danger to self or others;" "is capable of consenting to voluntary treatment;" and "is willing to be treated voluntarily."

On February 9, 2007, following her treatment at Tucker Pavillion, C.F.'s parents took her immediately to Island View Residential Treatment Center ("IVRTC") in Utah. At the time of her evaluation, C.F. was diagnosed by Dr. Jackson as follows:

DSM-IV:

| | |
|---|---|
| AXIS I: | 296.90 MOOD DISORDER, NOS |
| | V61.20 PARENT/CHILD RELATIONAL PROBLEM |
| | 314.90 HISTORY OF ADHD |
| | RULE OUT ABUSE OF A CHILD, VICTIM |
| AXIS II: | BORDERLINE FEATURES ARE NOTED |
| AXIS III: | NONE |
| AXIS IV: | PROBLEMS DUE TO ABUSE, FAMILY DISCORD, AND ENVIRONMENTAL STRESSORS |
| AXIS V: | CURRENT G.A.F.: 35 |
| | HIGHEST G.A.F. PAST YEAR: 45 |

At the time of her admission, C.F. was also assessed for risk of suicide and was placed on suicide precaution status as a result. C.F. was treated at IVRTC from February 9, 2007 through October 10, 2007.

CBH denied authorization for coverage on February 13, 2007, in a letter to IVRTC. The letter of denial referred IVRTC to pages 20 and 21 of the CBH Guide for details regarding the basis of CBH's denial.[3] Page 20 of the CBH Guide contains criteria for Admission and for Continued Stay in connection with "Child and Adolescent Psychiatric *Partial Hospitalization*." Page 21 of the CBH Guide contains information about "Child and Adolescent Psychiatric Intensive Outpatient Treatment."

---

[3] As mentioned above, the pages pertaining to *residential treatment* are pages 23-25; not pages 20-21, which pertain to *partial hospitalization* and *intensive outpatient treatment*.

The following day, February 14, 2007, a letter was sent to C.F., denying coverage for treatment on the basis that CBH's "physician advisor, Victoria Shampaine, MD, a Board Certified Psychiatrist decided . . . it is not medically necessary." [4] The letter referred C.F. to a website where she would be able to review the Guide's criteria. The February 14, 2007, letter stated that the clinical basis for the denial of coverage was:

> The participant is not demonstrating active medical or psychiatric symptoms that require 24-hour supervision. She is not an imminent danger to self or others. There is no acute risk that would prevent participation in treatment at a less restrictive level of care. She has not participated in or failed treatment at the partial hospitalization or intensive outpatient level of care.[5]

On February 20, 2007, C.F.'s step-mother called CBH and requested an expedited appeal. CBH scheduled a peer-to-peer review between Dr. Jackson at IVRTC and Deborah R. Duitch, M.D., a physician with Prest & Associates, whom CBH had retained to review the claim. Dr. Duitch reported back to CBH after she had spoken with Dr. Jackson and told CBH that she was upholding the denial based on the fact that criteria found on pages 23-25, #2, A, B, C, or D under Guidelines for Admission were not met.

The pages referenced by Dr. Duitch are for "Residential Treatment Facilities (RTC) of

---

[4] Apparently, CBH called C.F.'s treating psychiatrist, Dr. Jackson, for a "peer-to-peer" telephone conference. However, it appears that only one unsuccessful call was made to him on February 13, 2007, with a message that, if he could not be reached at 2:30 p.m. CDT, the decision would be made without his input because the "peer-to-peer" must be completed by 3:00. It is unclear what time the message was left for him, but the log entries suggest that the call was made after the deadline for the peer-to-peer review had passed.

[5] As will be discussed below, the criteria mentioned in this denial letter (and every subsequent denial letter) are at odds with the criteria set forth in the CBH Guide for residential treatment, which are set forth above at pp. 2-3.

Children and Adolescents" and #2, A, B, C, or D refer to the "Guidelines for Admission." A written denial was issued by CBH, based on Dr. Duitch's report, to C.F. on February 22, 2007 in which CBH again referred C.F. to a website for access to the Guide. The letter stated that:

> You do not need 24 hour supervision as you are not at risk of harm
> to yourself or others. You are medically and psychiatrically stable, has
> not [sic] attempted and failed an intensive outpatient program in the past 12
> months and can be safely managed in Outpatient treatment.

In February, 2008, after C.F.'s discharge, IVRTC finalized the entire medical record and submitted it to CBH with a letter explaining IVRTC's rationale as to why C.F.'s treatment should be covered. Included with IVRTC's letter were letters from Martin N. Buxton, M.D., F.A.A.C.P., D.L.F.A.P.A. and Thomas A. Burgess, LPC, recommending residential treatment for C.F. Both Drs. Buxton and Burgess had treated C.F. prior to her admission at IVRTC.

The letter from Dr. Buxton stated that "[c]linically it was clear that [C.F.] needed residential care for safety and treatment. . . . She had failed significant outpatient treatment prior to that acute [Tucker Pavilion hospitalization]." The letter from Dr. Burgess referenced C.F.'s participation in "intensive outpatient Dialectical Behavior Therapy" during which she had "continued to binge and purge and also cut on her arms and legs."

CBH wrote to C.F. on February 19, 2008 to notify her of a Committee Meeting scheduled for March 3, 2008 where she could appear, if she wished to do so, and present her arguments as to why the previous denials of coverage should be overturned. Following the Committee Meeting, which the Plaintiffs did not attend, CBH wrote to C.F. on March 5, 2008 and denied coverage for her residential treatment on the basis that:

> [Y]ou were not reported to be a risk of harm to self or others
> at the time of admission. You were not suicidal or homicidal.
> There was no indication of severe derangement of mood or
> perception such as psychosis, mania or severe depressive
> symptoms.

The letter also references the decision by CBH to ". . . uphold the previous determination and not authorize *acute psychiatric hospitalization*" (emphasis added).[6] Acute psychiatric hospitalization is not the same as residential treatment. The discrepancy in the language of the denial letter is significant because the criteria that CBH relied on in its letter, with references to being at a risk for self harm or being suicidal or homicidal, are symptoms indicating medical necessity for an *acute psychiatric* admission; not a residential treatment admission. The March 5, 2008 letter also informed C.F. that her appeal process had been exhausted.

## II. DISCUSSION

A. STANDARD OF REVIEW

A denial of benefits under an ERISA plan "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the benefit plan gives the administrator such discretion, then, absent procedural irregularities, the denial of benefits is reviewed under an arbitrary and capricious standard. *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1003 (10th Cir.2004). Such review is limited to "determining

---

[6] Prelitigation Record pp. 208-209.

9

whether [the] interpretation [of the plan] was reasonable and made in good faith." *Id*.

The Plan in this case grants CBH discretionary authority to "determine eligibility for benefits and to interpret the terms and conditions of the benefit plan," and therefore the court must review its decision under an arbitrary and capricious standard of review. Because the court does not find that a conflict of interest exists between CBH, the claim administrator, and the Plan, the court will review the case under the full deferential arbitrary and capricious standard of review.

**B. ANALYSIS**

Even under this deferential standard of review, the court finds that the decision to deny benefits for C.F.'s residential treatment was arbitrary and capricious. CBH utilized the wrong criteria to evaluate whether C.F.'s residential treatment admission and continued stay met the Guide's criteria and were eligible for coverage. It also appears that CBH selectively read the medical records and ignored the opinions of her treating physicians. CBH's determination, therefore, is not supported by substantial evidence and was arbitrary and capricious. CBH's *post hoc* rationalization for the denial of benefits will not be considered by the court because these purported reasons for the denial were never communicated to the F. Family.

**1. The Criteria Used by CBH**

The letters of denial from CBH, along with the notes of Dr. Duitch, the retained reviewer, make clear that CBH used the wrong criteria to evaluate the appropriateness of C.F.'s residential

10

treatment.[7] Similar language is used in each of the denial letters from CBH to justify its position that C.F.'s medical expenses are not covered at the residential treatment level of care:

> You do not need 24 hour supervision as you are not at risk of harm to yourself or others. You are medically and psychiatrically stable, has not [sic] attempted and failed an intensive outpatient program in the past 12 months and can be safely managed in Outpatient treatment.

However, the CBH Guide's criteria for residential treatment admission do not require that the patient be "a risk of harm to self or others." In fact, they require that the patient has reached "an acceptable degree of stability" and is "able to function with some independence and participate in structured activities that will assist in developing the skills necessary for functioning outside of the controlled psychiatric environment." There is also no requirement for the patient to be demonstrating "psychosis, mania or severe depressive symptoms." Rather, the patient must have a diagnosed psychiatric disorder and have tried and failed at lower levels of treatment. Thus, the bases relied on by CBH to deny C.F.'s claim did not correlate to the residential treatment level of care guidelines. CBH appeared to have denied C.F.'s residential treatment by applying criteria more appropriately applied to acute inpatient admissions and treatment.

There is no question that an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of

---

[7] In its initial denial letter, CBH referred to the wrong pages of the CBH Guide (pages 20 & 21), which do not apply to residential treatment. Dr. Duitch, in a subsequent letter, cited the correct pages (pages 23-25), but she listed incorrect criteria – criteria more appropriate for inpatient treatment.

discretion. *McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1259 (10th Cir. 1998) (citations omitted); *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002); *Tremain v. Bell Industries, Inc*., 196 F.3d 970, 976 (9th Cir. 1999); *Saffle v. Sierra Pac. Power Co. Bargaining Unit LTD Income Plan*, 85 F.3d 455, 458-60 (9th Cir. 1996); *Mhadbhi v. Jefferson Pilot Fin*., 255 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2003); *Troy v. UNUM Life Ins. Co. of Am*., 2006 U.S. Dist. LEXIS 14965, *31 (S.D.N.Y. 2006). The failure to act in accordance with the documents governing the ERISA plan is also a breach of fiduciary duty. 29 U.S.C. § 1104(a)(1)(D).

Thus, CBH's decision to deny benefits is not grounded on any reasonable basis and is therefore arbitrary and capricious and an abuse of discretion. *See Hancock v. Metropolitan Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009); *Caldwell v. Life Ins. Co. of No. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citing *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 n.4 (10th Cir. 1992)).

Not only did CBH employ the incorrect criteria, but a review of the pre-litigation record compels the conclusion that C.F. met the residential treatment criteria for admission. Here, CBH appears to have selectively reviewed the medical information and ignored relevant evidence, which also constitutes an abuse of discretion. "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *The Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Substantiality of the evidence is based upon the record as a whole:

> In determining whether the evidence in support of the administrator's decision is substantial, we must "take[] into account whatever in the record fairly detracts from its weight."

*Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (citing *Caldwell*, 287 F.3d at1282). If the correct criteria were applied, CBH's denial of benefits could not be supported by substantial evidence.

### 2. CBH's Purported Reasons for the Denial

CBH refers repeatedly to the fact that C.F. was being treated by IVRTC in Utah "…far from her home in Virginia." While CBH refers to several internal records reflecting CBH's concern about placing C.F. so far from her home, there is no evidence in the pre-litigation record that CBH ever communicated directly to the F. Family that this issue was a concern.[8] While there is some support for the fact that representatives of CBH might have told others, such as representatives of Tucker Psychiatric Hospital, about this concern, there is no evidence that

---

[8] It appears that CBH's concern about the distance between Virginia and Utah was that it would prevent the F. Family from engaging in therapy with C.F. in a face-to-face setting. According to CBH, this type of interaction was critical for the success of residential treatment under the criteria. The criteria, however, does not contain an absolute requirement for face-to-face therapy. Indeed, the criteria state that**:**

> "Telephonic conferences are not considered a substitute for this intervention. The only exceptions to this must be reviewed and approved and should be made on a clinical basis where either: the parents are considered harmful or unable to adequately care for the participant and immediate alternative placement is being pursued, or the family dynamics are such that intensive involvement may be counter production during the current treatment intervention."

Prelitigation Record at 107.

representatives from Tucker then told the F. Family about CBH's concerns. Thus, there is no evidence that CBH's concerns about the distance were ever communicated directly to the Plaintiffs, and they were certainly not listed in the denial letters as a basis for CBH to deny coverage for residential treatment.

Indeed, as discussed above, the reasons given in the three denial letters had nothing to do with the distance between Utah and Virginia. Rather, the denial was based on CBH's assertion that residential treatment was not medically necessary for C.F. – in Utah or anywhere else. CBH's letters do not tell the F. Family that residential treatment in Utah is not medically necessary but residential treatment in Virginia would be covered under the Plan.

It appears that the distance rationale now asserted by CBH in this case is a *post-hoc* rationalization for the denial of benefits. The failure of CBH to specifically state in its denial letters that it was not the residential treatment level of care per se that CBH would not approve for C.F., but rather the location of the residential treatment facility, is not merely a technical or academic defect. Specifically, 29 C.F.R. § 2560.503-1(g)(iii) states that at the time denial of the claim is sent to a claimant, the ERISA plan administrator must provide a "description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary . . .." This is a critical component of the first two letters that were sent from CBH to the F. Family in February of 2007. Had CBH told the F. Family that it was willing to approve residential treatment, but only in a location that would permit the family to engage in frequent face-to-face family therapy, the F. Family could have provided more information about the frequency of both telephonic and face-to-face therapy provided at IVRTC.

Alternatively, the Plaintiffs could have made arrangements to visit Utah from Virginia on a more regular basis for face-to-face therapy sessions. A third possibility is that the F. Family could have made more aggressive attempts to find a residential treatment facility that was closer to their home in Virginia. But CBH's failure to provide specific, unambiguous notice to the F. Family of its concerns about the distance between Virginia and Utah as a basis for its denial robbed the F. Family of any ability to address this concern in a way that would have allowed for the best interests of C.F. and her parents to be served.

Plaintiffs must have an opportunity to fully and fairly respond and carry out a meaningful pre-litigation appeal process. *Gaither v.Aetna Life Ins. Co.*, 394 F.3d 807 (10th Cir. 2004).[9] As explained by the Tenth Circuit:

> [ERISA and its implementing regulations require] a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.

*Gaither,* 394 F.3d at 807 (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir.2003)). This failure to engage in a meaningful dialogue with the F. family violates ERISA's claims processing and fiduciary duty standards. *Gaither*, 394 F.3d at 807.

CBH also argues that the F. Family failed to pre-certify the placement of C.F. at IVRTC

---

[9] CBH sent three written notices (the letters dated February 14, 2007; February 22, 2007, and March 5, 2008) to Plaintiffs that could be construed as notices that comply with the language of ERISA's claims procedure regulation. *See* 29 C.F.R.§ 2560.503(g)(i-v). None of these notices makes any reference to CBH's denial being based on the distance from Virginia to Utah or on the failure of the F. Family to pre-certify, as discussed below.

before taking her from Virginia to Utah. As with the distance argument raised by CBH, this argument is raised for the first time in litigation and should not be considered. But even if it is considered, the plan documents are clear in stating that the only adverse consequence to the F. family for a failure to pre-certify is a $500 penalty. The failure to pre-certify does not mean that CBH can simply deny C.F.'s claims at IVRTC. The terms of the Plan do not make the failure to obtain pre-certification a complete bar to later review and retro-certification by CBH of a patient's medical treatment.

A court may not consider *post hoc* rationales. *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007); *Kellogg v. Metropolitan Life Ins. Co*. 549 F.3d 818, 827 (10th Cir. 2008). The court may only consider the specific reason(s) for the denial set forth in the denial letters. *See Kellogg,* 549 F.3d at 828. The *Flinders* court stated that:

> To determine whether a plan administrator considered and asserted a particular rationale, we look only to those rationales that were specifically articulated in the administrative record as the basis for denying a claim (citing 29 U.S.C. § 1133(1) and emphasizing the reference to "specific reasons" that must be set forth in the initial denial).

*Flinders,* 491 F.3d at 1190-91. The *Flinders* court also cited *Marolt v. Alliant Tech Systems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998), which held that:

> the reason for this rule is apparent - '[w]e will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation' . . . This is consistent with the converse rule that a claimant may not urge new grounds outside the administrative record that would support the award of benefits.

*Flinders*, 491 F.3d at 1191 (citing *Marolt*, 146 F.3d 617, 620 (8th Cir 1998)); *see also Saffon v. Wells Fargo & Co. long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008).

These two *post hoc* reasons will not be considered by the court because they were never provided to the F. Family as a basis for CBH's denial of benefits, and thus the F. Family never had a chance to address these purported rationales for the denial of coverage.

### III. CONCLUSION

For the foregoing reasons and good cause appearing, IT IS HEREBY ORDERED that: Plaintiffs' Motion for Summary Judgment [Docket No. 22] is GRANTED and Defendants' cross-motion, characterized as a appeal [Docket No. 25] is DENIED. The Clerk of Court is directed to enter judgment in favor of Plaintiffs. Defendants are directed to provide coverage for C.F.'s treatment at IVRTC for 180 days, after a payment of a $250 deductible. Pursuant to Plaintiffs' request, the court does not address at this time the issues of prejudgment interest and attorneys fees.

DATED this 23rd day of December, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge